IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

THE NORTH FACE APPAREL CORP.,    )
A Delaware Corporation              )
                                 )
v.                             )     Case no. 4:09-cv-02029
                                 )
WILLIAMS PHARMACY, INC., et al.    )

## JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR AN ORDER OF CIVIL CONTEMPT

*Scratch a dog and you'll find a permanent job.*
**– Franklin P. Jones**

COMES NOW James A. Winkelmann, Jr. ("Jimmy"), James A. Winkelmann, Sr. ("Jim"), and Why Climb Mountains, LLC ("WCM") (collectively, "Defendants"), by and through their undersigned counsel, and for their Joint Memorandum in Opposition to Plaintiff's Motion for an Order of Civil Contempt, state as follows:

## FACTUAL BACKGROUND

Before indulging Plaintiff The North Face Apparel Corp.'s ("TNF") claims of contumacious conduct, it is essential that Defendants establish the timeline of events.  The underlying action was filed on December 10, 2009 by Plaintiff TNF against, *inter alia*, Jimmy and The South Butt, LLC ("TSB"), a Missouri limited liability company the existence of which has since terminated.  The parties to that litigation were scheduled to conduct a hearing before this Court on Plaintiff's Motion for Preliminary Injunction in April 2010.  On April Fool's Day 2010, the parties reached an agreement to settle this litigation.  After extensive negotiations between the parties and their respective counsel, including Plaintiff's in-house legal counsel and corporate representative, Barbara Kaplan, Esq., and the law firms of Bryan Cave, LLP and Greenberg Traurig, LLP, the parties eventually memorialized their agreement in the form of a

1

written Settlement Agreement.  As part of the Settlement Agreement, Jim, Jimmy and TSB

agreed to be bound to a Consent Injunction, which this Court entered on April 12, 2010 (Doc.

71).  It is important to note the Settlement Agreement called for the Defendants to adhere to a

specific action protocol as a strict condition precedent to the payment by Plaintiff to Defendants

of a significant amount of money in May 2011.

Plaintiff's first factual allegation in support of its claims for contempt stems from its

indignation that Jim and Jimmy organized WCM within two days of the entry of the Consent

Injunction.  There is no dispute that WCM was formed on April 14, 2010.  There is no dispute

that WCM was formed for the purpose of selling parody apparel.  THE BUTT FACE is ancillary

to WCM's primary parody apparel product.  The source for a vast majority of WCM's

admittedly modest sales is OLOP, the logo for which prominently features a pony riding a

preppy while brandishing a polo mallet, using the tag line "Save a Pony – Ride a Preppy".  To

assert that WCM was formed for the purpose of avoiding the agreement with TNF is simply

inaccurate.  WCM was formed as a vehicle through which Defendants would maintain a going

business concern selling OLOP apparel while Jimmy studied biomedical engineering at

University of Missouri (Mizzou), and participating in summer research programs at

Massachusetts Institute of Technology (MIT),  the Harvard Medical School and Massachusetts

General Hospital.

G. Roxanne Elings, Esq., counsel for Plaintiff throughout this litigation, filed a

Declaration (Doc. 79) in which she notes Jimmy registered as a matter of public record the

domain name "thebuttface.com" on December 17, 2009, approximately five (5) months before

the April 2010 settlement of the present case.  The Butt Face's Facebook page was created some

time in or about October 2010.  The truth is The Butt Face, and many other parody apparel ideas,

have been cerebrally gestating in Jimmy for quite some time.  WCM was and is the vehicle

through which those ideas have been and will continue to be brought to market.  Ms. Elings is

acutely aware of this fact because she also represents PRL USA Holdings, Inc., the company

which claims to own the POLO trademark that is commonly associated with apparel produced by

American fashion designer Ralph Lipschitz, more commonly known as Ralph Lauren.  Ms.

Elings filed a Notice of Opposition before the United States Patent and Trademark Office

("USPTO") on January 11, 2012 opposing the Trademark Application filed by WCM seeking to

register the OLOP trademark.

Ms. Elings was aware of The Butt Face even prior to her filing of the Opposition to OLOP in

January 2012.  She has been aware of The Butt Face since at least April of 2011 and prior to the

May 2011 payment by TNF to the Defendants of the amount required under the April 2010

Settlement Agreement.  As a result of the Settlement Agreement between the parties, Jim, Jimmy

and TSB were required to take certain actions and make certain representations of compliance to

TNF before TNF would issue the settlement payment contemplated under the settlement

agreement. The parties, by and through their counsel, began negotiating the form of the affidavit

containing the subject representations, among other obligations, on March 11, 2011.        On

April 12, 2011, prior to the payment by TNF to Defendants under the Settlement Agreement, Ms.

Elings issued correspondence to Counsel for TSB alleging that TSB violated the Settlement

Agreement and Consent Injunction by virtue of the creation of a Facebook page for The Butt

Face.  A true and correct (but redacted to maintain the confidentiality of certain other terms of

settlement) copy of this correspondence is attached hereto, incorporated by reference herein and

labeled Exhibit 1.  TSB denied any breach, affirmatively represented via affidavit that it had

complied with all terms of the Settlement Agreement and Consent Injunction and demanded that

TNF live up to its obligations under the Settlement Agreement.  TNF, by and through Ms. Elings' associate attorney, issued additional correspondence to Defendants further taking exception to The Butt Face's Facebook page.  A true and correct (but redacted to maintain the confidentiality of certain other terms of settlement) copy of this April 24, 2011 correspondence is attached hereto, incorporated by reference herein and labeled Exhibit 2.  Counsel for Defendants issued a response letter to TNF's counsel on April 26, 2011.  A true and correct copy of same is attached hereto, incorporated by reference herein and labeled Exhibit 3.  TNF subsequently satisfied its payment obligations to TSB via wire transfer in conformity with the Settlement Agreement and TSB responded in kind by providing TNF with its duly filed Articles of Termination on June 13, 2011.  The Butt Face apparel was available for sale beginning in June 2011.

Defendants heard nothing further from TNF between June 2011 and August 2012 when TNF filed the instant Motion.  As more fully set forth herein, The Butt Face is not in violation of the Consent Injunction *arguendo*, to the extent The Butt Face has violated the Consent Injunction, TNF waived any right to relief to which it otherwise was entitled the moment TNF issued its settlement payment to TSB in May 2011.  On a more practical level, Defendants have no interest in further interaction with the Plaintiff and if Plaintiff had so much as picked up the phone or written an e-mail to Defendants' counsel, this could have been avoided.  Unfortunately, like a fallen prize fighter, TNF insists on a rematch years after both brands have passed their prime.

## ARGUMENT

The Butt Face does not dispute that Jim, Jimmy and WCM are subject to the jurisdiction of this Court.  In fact, Jim and WCM have voluntarily joined this action as third party

4

interveners. (Docs. 86 & 88)  Similarly, Defendants agree that the evidentiary burden to be

overcome by the Plaintiff is the "clear and convincing evidence" standard.  As noted by

Plaintiffs, there are two *prima facie* elements.  First, Plaintiff must demonstrate that there is a

specific and definite order of the court.  Second, the Plaintiff must demonstrate the Defendants

have violated that order.  For purposes of this Motion, Defendants will concede that there is a

specific and definite order of the court, as reflected in the text of the Consent Injunction dated

April 12, 2010 (Doc. 71).

**I.**      **Plaintiff Has Waived Any Right to Relief by Sitting on Its Rights**

Yet again, much like Claud Raines in his classic role as Louie the French Prefect of

Police in Humphrey Bogart's stoic *Casablanca*, TNF now appears to be disingenuously

"shocked" that there is gambling going on.  As noted above, Plaintiff has been aware of THE

BUTT FACE for quite some time, April 12, 2011 to be exact.  *See* Exhibit 1.  Between April, 12,

2011 and August 3, 2012, Plaintiff and Defendants exchanged several pieces of correspondence

to resolve the issues between them pursuant to their Settlement Agreement and Plaintiff has paid

a substantial sum of money to Defendants to resolve this case.

To succeed on a claim of laches, the Defendants must prove: (1) a delay in asserting the

claim; (2) the delay was inexcusable; and (3) undue prejudice to the Defendants from the delay.

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999).  Here,

there was a delay of at approximately sixteen (16) months between the time Plaintiff notified

Defendants of their awareness of THE BUTT FACE and the time Plaintiff filed their Motion for

Contempt.  Plaintiff has expressed no excuse for such a significant delay, particularly in the

context involved herein.  Not only did the Plaintiff raise the issue with Defendants, but

Defendants responded to the Plaintiff's concern and Plaintiff subsequently issued payment to

Defendants to resolve the issues between them.  Defendants genuinely, and reasonably, believed that this issue was resolved following the April 2011 discussion of same and May 2011 payment from Plaintiff.

As a result and in reliance upon this perceived resolution, Defendants proceeded with the next step of their business plan to generate physical THE BUTT FACE inventory and expand their marketing of same.  The product arrived in the marketplace in June 2011.  Defendants have expended significant time and resources during this incubation phase of their startup company that they would not have expended had they known that TNF still took issue with THE BUTT FACE after the parties had discussed these issues.  The prejudice that resulted to Defendants from Plaintiff's lulling is undue and was unnecessary.  Plaintiff should not now be permitted to come into this Court seeking a finding of contempt to undue all of the actions Defendants took in reliance on Plaintiff's actions and inactions from April 2011 through August 2012.

In essence, TNF was represented throughout the underlying proceedings giving rise to the Consent Injunction and the Settlement Agreement by two of the nation's largest law firms. Moreover, TNF's in-house general counsel was a party to the detailed and protracted negotiations corresponding to the terms and text of the dispositive documentation. The negotiation process involved multiple iterations of the terms, the removal of proposed terms and the inclusion of added terms. If TNF so desired, it was certainly within the purview, expertise and capacity of its representatives to seek and procure a term which would effectively obviate the ability of the individual defendants herein from prospectively employing parody in any respect within the context of apparel in general and TNF specifically. However, such was not the case. The attempt of TNF to retroactively broaden the scope of the terms of the dispositive

documentation and the applicable restrictions to be imposed on the Defendants clearly falls within the scope of negotiator's remorse but outside of the scope of legal entitlement.

In short, The Butt Face was open and notorious prior to the Settlement Agreement, its presence was acknowledged prior to the payment by TNF to the Defendants per the Settlement Agreement, and has been well within the public domain for in excess of one-year and ten months prior to the filing of the present Motion for Contempt. At some point, the oft-deployed but infrequently adopted doctrine of laches finds a suitable residence.  Welcome home.

**II.     The Heightened Standard of Conduct Asserted by the Plaintiff is Not the Law in the 8th Circuit and Should Not be Applied for the First Time to Support Imposition of Monetary Penalties Against Defendants.**

There are two specific and definitive prohibitions contained in the Consent Injunction. The first prohibits the Defendants from infringing the Plaintiff's trademarks.  The second prohibits the Defendants from diluting the Plaintiff's trademarks.  Plaintiff raises the infringement allegation first within the context of its Memorandum in Support of Motion and sets forth non-binding case law from the 2nd, 7th, 9th and 11th Circuit Courts of Appeals concerning the obligations of a Defendant to keep a "safe distance" from the previously enjoined trademark when using a new trademark.  Plaintiff's cite an 11th Circuit case in an effort to demonstrate this rule is applicable equally to infringement and dilution theories.

First, and most obviously, none of these cases are binding in the 8th Circuit.  Under ordinary circumstances, Defendants would note the impropriety of adopting non-binding precedent.  However, this issue is particularly bothersome in the context of a contempt proceeding where the Plaintiff is seeking to punish the Defendants for not adhering to a standard that is neither the law in or embraced by this jurisdiction.  The application of these new standards is extremely inappropriate where Plaintiff asserts that the Defendants have "willfully" violated

this Court's Order and is seeking payment of monetary penalties on account of same. Defendants have not been on notice that the "safe distance" standard is the law of the land in the 8th Circuit and, as a result, it would be fundamentally unfair to apply such a standard for the first time in this circuit within the context of a contempt proceeding wherein the Plaintiff is seeking monetary penalties.

In short, while Defendants do not believe it is appropriate to adopt this heightened standard (and Plaintiff has not articulated a rationale for adopting this standard), Defendants simply ask that any adoption of this new standard not be relied upon for a finding of willfulness or relied upon to impose monetary penalties against Defendants.

### III.    Plaintiff Has Not Made a Prima Facie Showing of Infringement by Defendants.

Plaintiff attempts to preempt Defendants' obvious and inevitable claim of parody by asserting that Defendants have "effectively waived this defense by consenting to the Injunction after having asserted it in the prior court filings.  Having subsequently conceded in the Injunction that THE SOUTH BUTT is not a parody, they cannot now argue that THE BUTT FACE is a parody.  Indeed the Injunction makes no exceptions for parodies".

First, Defendants did not concede that THE SOUTH BUTT is not a parody in the Injunction.  The word "parody" is not to be found in either the Consent Injunction or the underlying Settlement Agreement.  Plaintiff argues this means there is no exception for parodies. It is equally plausible that the Injunction, therefore, does not prohibit parodies.  What is certain, Defendants agreed, in exchange for the payment of money, that they would consent to be enjoined from using any of THE SOUTH BUTT marks or any other mark that constitutes a reproduction, counterfeit, copy or colorable imitation of the THE NORTH FACE trademarks. Defendants have not used THE SOUTH BUTT marks since the entry of the Injunction except as

8

expressly permitted under the terms of the Settlement Agreement.  Similarly, Defendants have

not used any other marks that are reproductions, counterfeits, copies or colorable imitations of

THE NORTH FACE trademarks.

Second, the Plaintiff is conflating the THE SOUTH BUTT trademark with the THE

BUTT FACE trademark as if the two are synonymous.  There is no basis in the record for this

loin challenging leap and Plaintiff provides no explanation for same outside of its brief lay

characterization of purported similarities between the marks.

Third, Plaintiff asserts that the parody defense is not recognized as a matter of law.  The

Parody Defense is Applicable to Claims of Infringement.  Plaintiff cites the familiar *Anheuser*

*Busch, Inc. v. Balducci Publ'ns* case which holds that a purported parody that creates a

likelihood of confusion constitutes trademark infringement.  28 F.3d 769, 776 (8th Cir. 1994)

(emphasis added).  Plaintiff goes on to cite the famous "Mutant of Omaha" and "Debbie Does

Dallas" decisions.  None of those cases decided that the parody defense is unavailable in a

trademark case.  Those were simply fact intensive inquiries regarding the availability of the

defense where there is a likelihood of confusion between the senior and junior marks.

Judge Mummert adroitly noted this distinction in the "Buttwiper" case cited by Plaintiff

in its Motion (and discussed in previous filings between the parties) when he confirmed that

claiming "parody" is insufficient to fend off otherwise legitimate claims of infringement or

dilution.  Put succinctly, there are confusing parodies and non-confusing parodies.  In Judge

Mummert's words, "a non-infringing parody is merely amusing, not confusing".  *Id.* at 985.

Thus, the issue is not as Plaintiff suggests.  Parody is recognized as a defense to infringement

where the parody is not confusing.  Naturally, this is a fact intensive inquiry and, thus far,

Plaintiff has presented no evidence of confusion.

9

As this Court may recall, the Defendants in the original litigation filed a very basic Motion to Dismiss (Doc. 28) in which they requested the Court to conduct its own side-by-side analysis and determine that there was no infringement by TSB because its trademark was not confusingly similar to the TNF trademarks.  This Court entered an Order (Doc. 53) in which it declined to dismiss the Complaint on the basis of such a comparison.  Here, the roles have been reversed.  The Plaintiff has filed this Motion seeking a finding of contempt by Defendants and has offered nothing more than a bald (mis)characterization of the differences between the TSB trademarks and the THE BUTT FACE trademark.

The Court did not accept bald characterizations of similarities and dissimilarities in 2010 and should not accept them now.  Nonetheless, Defendants represent to the Court that they did not "substitute" any THE BUTT FACE design element for any THE SOUTH BUTT design element.  As indicated above, and as acknowledged by Ms. Elings in her Declaration the THE BUTT FACE concept has been in the works since December 2009.  It is not a mere re-tooling of the THE SOUTH BUTT trademark that came into existence following the settlement of this litigation in April 2010.

The swaying elephant in this courtroom is the complete absence of any discussion of confusion in the marketplace.  The Plaintiff comes to this Court seeking extraordinary relief and yet, it does not provide even a dropping of evidence of confusion.  A cursory review of the Motion, Memorandum in Support and the three (3) Declarations filed by Plaintiff fail to present a single instance of confusion between THE BUTT FACE and THE NORTH FACE trademarks or any evidence to support a finding that there is a likelihood of confusion between the two marks.  Such a dearth of support is insufficient to meet the ordinary civil burden, much less the "clear and convincing" standard applied in a contempt proceeding.

10

To the extent, Plaintiff is asserting the Declaration of Gerald Ford (Doc. 78) is evidence of infringement, Defendants rebuke any such assertion.  The study of Dr. Ford is, by its terms, a study of "association" between THE BUTT FACE and THE NORTH FACE trademarks and not one of "confusion".  In fact, Dr. Ford expressly stated the following:

> In the instant matter, at the request of Davis Wright Tremaine LLP, counsel for the Plaintiff, The North Face Apparel Corp. ("The North Face" or "Plaintiff"), I designed and caused to be conducted a survey to address the issue of likelihood of dilution with respect to Defendants' use of "The Butt Face" name and logo. Specifically, the survey was designed to measure the degree, if any, to which Defendants' use of "The Butt Face" name and logo is likely to cause, in a post-sale situation, is likely to cause [sic] an association with Plaintiff's The North Face mark.  *See* Doc. 78 at ¶ 2.

Thus, it is beyond cavil that all of the empirical evidence provided by Plaintiff's expert to this Court is in the form of a dilution survey, a survey of association, not confusion. Absent evidence of actual confusion or a likelihood of confusion, there can be no finding of infringement.  Plaintiff has presented no evidence of any form of confusion in any circumstance (i.e. pre-sale, post-sale, initial interest, etc.)  Accordingly, Plaintiff cannot meet the "clear and convincing" standard with respect to its claim of infringement.

To determine whether there has been any infringement, the Court shall evaluate: (a) the strength of the Plaintiff's trademark(s); (b) the degree of similarity between the two marks; (c) the competitive proximity of the products; (d) the Defendant's intent to confuse; (e) actual confusion; and (f) the degree of care reasonably expected of potential consumers.  *SquirtCo. V. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

### a.  Strength of Plaintiff's mark(s)

Defendants do not dispute that Plaintiff's mark(s) are quite strong.  There are two matters to note as a result.  Both support the notion that the strength of the Plaintiff's mark(s) tip this factor in favor of Defendants.  First, in *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846

11

F.2d 727 (Fed. Cir. 1988), the court held confusion was unlikely between the famous mark B.V.D. for men's underwear and the mark B.A.D. for clothing, including undergarments.  It reasoned that the better known a mark is, the more readily the public becomes aware of even a small deviation from it.  This case is certainly an outlier in the Trademark arena, but it does wholly support the proposition that, when confronted with unique facts, the Court may find a mark to be so famous that the consuming public's awareness of it is so heightened that it becomes conditioned to notice even small deviations.

THE BUTT FACE trademark is, as detailed below, more than a slight deviation from Plaintiff's mark(s).  It is Defendants' position that the ubiquitous nature of THE NORTH FACE has conditioned the consuming public to become intimately familiar with Plaintiff's mark and given it the ability to instantly recognize the Defendants' marks' variations from same.

Second, the strength of Plaintiff's mark(s) tip this factor in favor of Defendants due to the inherent nature of parody.  Defendants direct the Court's attention to *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 f.3d 252, 262 (4th Cir. 2007) where the court held that where defendant parodied plaintiff's mark, the fame of plaintiff's mark actually diminished any likelihood of confusion.  *See also*, *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 416 (S.D.N.Y. 2002).  The *Louis Vuitton* court held, "while it is true that finding a mark to be strong and famous usually favors the plaintiff in a trademark infringement case, the opposite maybe true when a legitimate claim of parody is involved. [. . . ] In cases of parody, a strong mark's fame and popularity is precisely the mechanism by which likelihood of confusion is avoided."  *Id.* at 261,

In the landmark trademark decision *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987), the Tenth Circuit held, "In one sense, a parody is an attempt 'to

derive benefit from the reputation; of the owner of the mark, if only because no parody could be made without the initial mark." *Id.* at 1486 (internal citation omitted).

It is fundamental that one cannot parody an item which is not familiar with the audience to which that parody is directed. Therefore, if parody is to be recognized as a legitimate factor mitigating against likelihood of confusion, which it is, the Court should find the great strength of Plaintiff's mark(s) favors Defendants herein, as they are parodists of same.

**b. Similarity between Plaintiff's mark(s) and Defendants' marks**

Defendants' mark is similar to Plaintiff's mark(s) only to the degree necessary to invoke Plaintiff in the minds of potential customers for the purpose of creating an effective and legally recognized parody. The marks are dissimilar enough to indicate Defendants' products were not produced, licensed, approved or otherwise associated with Plaintiff. The public's intimate familiarity with the THE NORTH FACE brand serves only to preclude the very confusion about which TNF complains.

First, the only similarity in the text of the Defendant limited liability company's logo with that of the Plaintiff are the words "The" and "Face". Second, the font used by WCM is different from that employed by the Plaintiff. Third, the text "The Butt Face" is patently dissimilar in sight, sound and meaning to "The North Face."

When placed in context on Defendants' apparel, the comparison remains favorable to Defendants. For example, the situs of the logo employed by WCM on its apparel is the opposite of the situs of the logo employed by The North Face on its apparel. The "butt face" design portion of The Butt Face logo is comprised of an altered half of the smiley face popularized in the 1970s, which, viewed differently, resembles a stylized rendering of the cheeks found on either side laterally of that portion of the human anatomy generally associated with bowel

13

evacuation.  This butt/face dichotomy provides the basis for the tiered THE BUTT FACE text to the right of the logo and the phrase NEVER STOP SMILING!  at the bottom of the design.  The "half dome" design mark of the North Face is comprised of three thinner lines curved downward from the right side of the text "The North Face."  The parties could likely fill many pages detailing the differences and similarities between the designs, but these are the most important elements from Defendants' perspective.

The recognition of these differences is critical to the success of Defendants' parody.  Plaintiff has stated, and through millions of dollars' worth of marketing, has convinced the public that its "half dome" design is a stylize rendition of the north face of a mountain in Yosemite National Park and that the north face of that mountain is the most challenging to climb.  Thus, WCM's "butt face" mark, which represents both a smile and the human buttocks and is marketed to reflect the humorous and irreverent spirit embodied by WCM in direct opposition to the serious and adventurous spirit espoused by The North Face.  WCM's mark NEVER STOP SMILING! is, similarly, a parody of Plaintiff's Hardy Boy-like but adventurous motto "Never Stop Exploring".  It should further be noted that the term "butt face", which Defendant uses to describe its mark, is a commonly used comedic device (*See e.g.* In Living Color comedic sketches of fictional family "The Buttmans") and is deployed by school-aged children and puerile adults across America in petty disputes where absurdist name calling is deemed appropriate and found, on occasion, to be effective.

Finally, the Plaintiff would have this Court enter a contempt order on the strength of the visual comparisons found in Motion.  Defendants urge the Court to adopt the approach of the *Jordache* court when it wrote, "In evaluating similarity, "it is axiomatic in trademark law that 'side-by-side' comparison is not the test.  The marks "must be compared in the light of what

14

occurs in the marketplace, not in the courtroom."  A prospective purchaser does not ordinarily

carry a sample or specimen of the article he knows well enough to call by its trade name, he

necessarily depends upon the mental picture of that which symbolizes origin and ownership of

the thing desired.  Therefore, the court must determine whether the alleged infringing mark will

be confusing to the pubic when singly presented."  *Jordache,* supra at 1487-1488 (internal

citations omitted).

### c.  Defendants' Products are Competitively Distant From those of Plaintiff

Defendants offer their products for sale exclusively on the Internet through their own web

shopping cart, which makes them available throughout the United States.  They are not globally

available as WCM to date does not ship internationally.  WCM  products are not sold on any

website that also sells North Face products.  WCM products to date are sold in but a few

independent novelty shops in upstate Michigan.  Plaintiff's "brick and mortar" sales are

completed through an extensive network of its own retail locations and those of large third party

retailers.

Finally, WCM's products are not targeted to, and are not believed to appeal to the same

customers as The North Face.  Upon information and belief, the customers of WCM seek out

WCM products and purchase them while specifically aware that the products are not affiliated

with The North Face (or Ralph Lauren) and even *because* the products are not affiliated with The

North Face or Ralph Lauren.

### d.  Defendants Do Not Intend to Pass Off Their Goods as Those of Plaintiff

An inference of intent arises where defendants, with knowledge of a competitor's marks,

choose a similar mark from an infinite number of possibilities. *Empi, Inc. v. Iomed, Inc.*, 923

F.Supp.1159, 1167 (d.Minn. 1996); *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419,

1429 (D.Minn.1989).  First, Defendants dispute that WCM's products compete with North Face's.  Prior to the settlement of this matter, Defendants took a very clear and very public "anti-North Face" position.  The South Butt was a brand for those who specifically sought attire that was not THE NORTH FACE.  Similarly, THE BUTT FACE is a brand for use by those who specifically seek non-TNF attire.

Second, where parody is concerned, the aforementioned inference of intent to "pass off" is eliminated.  The *Jordache* court correctly noted, "where a party chooses a mark as a parody of an existing mark, the intent is not necessarily to confuse the public but rather to amuse".  *Jordache,* supra at 1486 (citing *Trademark Parody: A Fair use and First Amendment Analysis*, 72 Va. L. Rev. 1079, 1079-80 n.4 (1986)).  Defendants' intent is congruent with that of the maker of Lardashe jeans over twenty years ago, except that Defendants herein present with an even stronger case against finding intent to "pass off".  THE BUTT FACE'S entire existence is premised on the notion that it is **not** The North Face.

The *Jordache* court specifically addressed the inference, when it held, "Our single concern here, however, is whether an intent to parody an existing trademark supports an inference of a likelihood of confusion under the reasoning that one who chooses a mark similar to an existing mark intends to confuse the public.  We hold that it does not.  An intent to parody is not an intent to confuse the public." *Jordache*, supra at 1486 (internal citation omitted).

### e.  Plaintiff Cannot Demonstrate Actual Confusion of the Parties' Marks

Plaintiff makes no attempt to demonstrate actual confusion between Plaintiff's mark(s) and those of WCM.  Plaintiff is not required to prove actual confusion in order to obtain relief and is only required to prove a likelihood of confusion.  15 U.S.C. §1114(1).  While true, it has

16

long been recognized that actual confusion is the best evidence of a likelihood of confusion in the marketplace is actual confusion.  *See Jordache*, supra at 1487.

It is crucial that the Court take notice that the Plaintiff sets forth its options regarding what it may attempt to prove in terms of confusion on pages 16-17 of Motion.  However, after setting forth the standards, Plaintiff makes no effort to demonstrate how it satisfies the confusion standard.

### f.  Degree of Care by Customers

Much as it did in connection with the confusion issue, Plaintiff has outright declined to discuss the degree of care exercised by customers in the marketplace.  Defendants believe there is simply no likelihood that a purchaser of THE BUTT FACE products will be confused that they are buying North Face products when doing so.  This fact appears to be conceded when Plaintiff fleetingly asserts that it has the option of proving confusion by demonstrating consumers may be confused after the point of sale.

Plaintiff correctly notes that an action for trademark infringement may be based on confusion of consumers other than direct purchasers, including observers of an allegedly infringing product in use by a direct purchaser.  Plaintiff has not alleged in its Motion or produced any evidence that will show there is any likelihood of post-sale confusion.

The degree of care by consumers is traditionally focused on the degree of care utilized by those who will actually purchase the product.  *Insty\*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 671 (8th Cir. 1996).  Frankly, there are not many customers of WCM generally, and even fewer who purchase THE BUTT FACE.  What does exists regarding customers of WCM evidences consumers are intentionally seeking out WCM products.

Because the relevant factors weigh in favor of Defendants, the Court should not find any infringement by Defendants of Plaintiff's trademark(s).

**IV.     Defendants Have Not Diluted Plaintiff's Trademark(s).**

To make a case for dilution, a plaintiff must prove (a) it has a valid mark, (b) its mark is famous and distinctive, and (c) defendant's use of the mark is likely to dilute Plaintiff's mark. *See*, e.g., *Viacom , Inc v. Ingram Enterprises, Inc.,* 141 F.3d 886, 888 (8th Cir. 1998).  Here, Defendants do not dispute that Plaintiff has valid marks and those marks are famous and distinctive.  Defendants vehemently dispute and deny that Defendants' THE BUTT FACE mark is likely to dilute Plaintiff's mark(s).

**a.     Defendants Have Not Diluted Plaintiff's Trademarks by Blurring.**

Plaintiff claims Defendants' mark will dilute their mark(s) both by blurring and tarnishment.  Dilution by blurring requires a court to consider the following factors: (a) the degree of similarity between the mark or trade name and the famous mark; (b) the degree of inherent or acquired disctinctiveness of the famous mark; (c) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (d) the degree of recognition of the famous mark; (e) whether the user of the mark or trade name intended to create an association with the famous mark; (f) any actual association between the mark or trade name and the famous mark.

The plain text of the statute appears to direct courts to consider the intent to create an "association" and any actual "association" to favor plaintiffs.  However, as is frequently the reality of the practice of law, one must go beyond the plain language contained in the text.  A strict interpretation of the statute would preclude the existence of any parody because a parody cannot be successful unless it references the subject of the parody in the mind of the audience.

We know from the *Louis Vuitton* and *Jordache* cases, among many others, that the dilution statute does not preclude a successful parody despite the "association" created.  Indeed, an "association" is essential for a successful parody.  Courts have elaborated slightly on how "association" is to be treated.

Plaintiff notes that a court should focus on whether the "association [ . . . ] impairs the distinctiveness of the famous mark".  *Starbucks Corporation v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 108-109 (2nd Cir. 2009).  This case was originally cited by Defendants in connection with their response to Plaintiff's Motion for Preliminary Injunction and now appears to be embraced by Plaintiff, which has cited same in its Motion for Contempt filed herein.

Concerning the first factor, Defendants have incorporated only so much of Plaintiff's mark into their THE BUTT FACE mark to cause a viewer of the mark to make an association between the two marks and, subsequently, appreciate the humor of the WCM mark.

Defendants will concede the Plaintiff's mark(s) are inherently distinctive.  Without that distinctiveness, Defendant's parody could not be successful.  Accordingly, this factor should be viewed neutrally.

Defendants have no reason to dispute that Plaintiff has engaged in substantially exclusive use of the THE NORTH FACE mark(s).  Again, this factor is neutral insomuch as the Plaintiff's exclusive use of the mark is essential to the success of Defendants' parody.

Similarly, the degree of recognition factor is neutral because recognition is the foundation for Defendants' parody.  Without recognition, Defendants' parody will fall flat with consumers who do not recognize Plaintiff's senior mark(s) that is the subject of Defendants' mark's commentary.

Defendants admit that they intended to create an association with the famous mark.  That is the purpose of a parody is to create an association and use that association to make a comment to a consumer.  This factor favors neither party in a parody context.

To establish the actual association between Plaintiff's and Defendants' marks, Plaintiff offers the Declaration of expert Gerald Ford.  Mr. Ford's report finds 34.5% of respondents <u>associate</u> THE BUTT FACE with THE NORTH FACE. Plaintiff offers no analysis as to why the distinctiveness of its mark(s) would be impaired in any fashion by the association created between Plaintiff's mark(s) and Defendants' marks.

Defendants have cited several examples below of responses that Mr. Ford received from survey subjects that support a finding that THE BUTT FACE is a successful parody:

Respondent 1027 responded to seeing THE BUTT FACE t-shirt by saying, "Really clowning North Face as Butt Face.  The T-shirt designer has an ass face."

Respondent 1038 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because, "It's kind of like The North Face brand but a joke instead".

Respondent 1075 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because it "looks like their logo, and it's a play off their name".

Respondent 1085 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because "it says Butt Face which is similar to North Face".

Respondent 1086 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because "they're very similar to North Face.  I can see that they're like a spoof company, I guess".

Respondent 1091 responded by saying THE BUTT FACE is "a parody of The North Face North Face logo" [. . . ] "[b]ecause it looks kind of like it and has a similar name".

Respondent 1092 responded by saying THE BUTT FACE is "an insensitive (in-a-few-ways) spoof of The North Face".

Respondent 1096 responded by saying THE BUTT FACE "name and logo reminds me of The North Face brand" [ . . . ] "[b]ecause North Face is well known for its 'butt' logo on its clothing" [ . . . ] [t]he only other company I can think of right now is South Butt" [ . . . ] "[b]ecause I learned of South Butt during the time that North Face sued them for trademark infringement".

Respondent 1129 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because "this shirt is a parody of that brand".

Respondent 1132 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because "it is clearly a parody of The North Face's logo". Upon follow up questioning, Respondent 1132 stated that THE BUTT FACE logo did not remind him of any other brands **"because it's obvious!  It's completely [expletive] obvious what it is!  You are making fun of The North Face!  It is completely moronic for you to ask me fifteen [expletive] times what it is when it's obvious? God, you market research people are complete [expletive] morons!"** (emphasis added).

Respondent 1137 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because the "logo looks like The North Face, and The Butt Face is a funny take-off of The North Face.  Sure looks like a rip-off of The North Face to me."

Respondent 1145 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because they "look very similar, however.  North Face is definitely not Butt Face".

Respondent 1174 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because "it looks like the same logo The Norht Face uses. But, you guys are trying to make fun of it by calling it The Butt Face".

Respondent 1191 responded by saying THE BUTT FACE reminded him/her of THE NORTH FACE because it "seems like a company mocking the name North Face".

Each of these examples demonstrate the sophistication of the marketplace.  None of these people were confused by the t-shirt, all of them made the association between the two brands and each of them recognized Defendants' product as a parody, while not necessarily using that word.

### b.      Defendants Have Not Diluted Plaintiff's Trademarks by Tarnishment.

Plaintiff's discussion of tarnishment is confined to a single paragraph on pp. 15-16 of Plaintiff's Memorandum in Support.  Defendants do concede that it is there intent to create an association between WCM's THE BUTT FACE marks and Plaintiff's THE NORTH FACE mark for the purpose of parody.  However, what is "unwholesome or degrading" is, like obscenity, a matter of subjective interpretation.  Defendants will certainly concede that their parody is immature and, indeed, sophomoric and not tremendously clever. That, however, is not the same as unwholesome or degrading.  "As smooth as a baby's butt" does not conger up unwholesomeness or degradation.  To the contrary, it emotes purity and piety.

It can hardly be said that the word "butt" or a stylized cartoon rendering of a butt is, in our modern American society, so outside the range of cultural acceptability that it is to be labeled "unwholesome" or "degrading".  Perhaps Defendants, and even their legal counsel, are a bit depraved, but the word "butt" in combination with Defendants' "butt face" logo can hardly meet those standards in the "pornocopious" America of 2012.

Plaintiff cites the *Anheuser-Busch, Inc.* case from 1996 to say that he term "butt" has already found to constitute dilution by tarnishment.  However, the *Anheuser* court did not state that the word "butt" was, as a matter of law, tarnishing.  Simply put, the 1996 California court found under the facts of that case that the word "butt" in combination with the other elements of the mark and product, was tarnishment.

Indeed, one need not look any further than the *Jordache* case to find that a term generally believed to be a more crude reference to the human posterior has been an accepted by the court in a parody context.  That is, the parody product "lardashe" jeans, a product for plus sized women, was deemed an acceptable parody of the much more famous jeans sold under the

Jordache trademark.  Obviously, the "lardashe" mark was a pun referencing people with fat butts or "lard asses".  As such, Defendants do not believe it is possible for their mark to rise to the level of degradation or unwholesomeness sufficient to constitute dilution by tarnishment.

## CONCLUSION

Defendants are not in violation of the Consent Injunction and, for the reasons set forth above, Plaintiff's Motion for Sanctions should be denied.  In the event, the Court finds the Defendants are in violation of the Injunction, the Court should rely upon the heightened standards cited by Plaintiff, which have previously not been applied in the 8th Circuit, to support the imposition of monetary penalties against Defendants.  Defendants further pray for an award of their attorneys' fees and costs spent opposing Plaintiff's Motion.

KODNER WATKINS KLOECKER, LC


By:___/s/ Albert S. Watkins_____
     ALBERT S. WATKINS, LC #34553MO
     MICHAEL D. SCHWADE, #60862MO
     7800 Forsyth Boulevard, Suite 700
     Clayton, Missouri 63105
     (314) 727-9111
     (314) 727-9110 Facsimile
     albertswatkins@kwklaw.net
     mschwade@kwklaw.net


## CERTIFICATE OF SERVICE

Signature above is also certification that on September 21, 2012 a true and correct copy of the foregoing was electronically filed with the Clerk of the Court utilizing the CM/ECF system which will send notification of such filing to all counsel of record.