IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| THE NORTH FACE APPAREL CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:09-cv-02029-RWS |
| ) | |
| WILLIAMS PHARMACY, INC., ) | |
| JAMES A. WINKELMANN, JR., and ) | |
| THE SOUTH BUTT LLC, ) | |
| ) | |
| Defendants. ) | |

**REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR AN ORDER OF CIVIL CONTEMPT**

James A. Winkelmann, Sr. ("Winkelmann, Sr."), James A. Winkelmann, Jr. ("Winkelmann, Jr.") and Why Climb Mountains, LLC ("WCM") (together the "Respondents") concede in their Joint Memorandum in Opposition to Plaintiff's Motion for an Order of Civil Contempt (hereinafter "Opp.") [Doc. 94] at 4-5 that: (1) they are subject to this Court's jurisdiction, and (2) this Court's injunction is specific and definite.  So, because Respondents must be held accountable for conduct that violates this Court's injunction (the "Order"), they should be held in contempt.

- The North Face Apparel Corp. ("The North Face") did not unreasonably delay in bringing its contempt motion because: (1) its early, nonjudicial efforts to obtain compliance were sufficiently successful; (2) after Respondents extracted payment from The North Face under the terms of the settlement agreement, escalated their conduct—disregarding this Court's Order and taunting The North Face—in anticipation that any action taken by The North Face would bring publicity to fuel sales or that The North Face's need to protect its marks would enable Respondents to extort an even larger pay-off; and (3) The North Face, without involving the Court, consistently tried to get Respondents to comply with the injunction before bring its timely motion.

- Respondents should not even be given an opportunity to assert laches because their "unclean hands" -- established by infringing and diluting conduct intended to bring them unjust enrichment -- bars that affirmative defense.

- Respondents' misrepresentation of the law regarding the "safe distance" rule -- without citation to any authority -- attempts to obscure the admittedly specific and definite language of the injunction that they negotiated through their attorney.

2

- Respondents cannot avail themselves of parody to absolve their willful violation of this Court's Order so that they can unfairly trade upon and profit from the fame of The North Face's marks (on the right below).

 

- Parody is not a defense to dilution where, as here, the diluting party uses its marks "as a designation of source for the person's own goods or services," most notable in this case from Respondents' efforts to register with the United States Patent and Trademark Office.

For each of these reasons, as more fully explained below, Respondents should held in contempt and sanctioned for violating this Court's specific and definite Order.

### I. ARGUMENT

**A. Respondents' Laches Defense Fails**

Laches does not prevent this Court from enforcing its own Order because: (1) The North Face has not unreasonably delayed in bringing Respondents' contempt to this Court's attention in that The North Face has engaged in other, less severe efforts to bring Respondents into compliance and Respondents have not shown undue prejudice; (2) Respondents were on notice that their conduct violated this Court's Order and they still refused to comply; (3) by intentionally pursuing a course of conduct to obtain a financial gain from taunting The North Face, Respondents come to this Court with unclean hands.

3

1.      **The North Face Did Not Unreasonably Delay In Bringing Its Contempt Motion**

Although *unreasonable* delay in moving for a contempt motion may furnish a defense of laches to a charge of contempt, *see Aris Isotoner, Inc. v. Berkshire Fashions, Inc.*, 924 F.2d 465, 466-67 (2d Cir. 1991) (remanding to district court to consider evidence as to whether delay of two and one-half years justified defense of laches); *Coilcraft, Inc. v. Inductor Warehouse, Inc.*, 2007 U.S. Dist. LEXIS 52350, at *33 (N.D. Ill. July 18, 2007), The North Face reasonably and responsibly pursued Respondents' violations in a diligent manner. While it is a fact dependent question, many courts have found two- to five-year delays do not trigger a claim for laches. *Ansehl v. Williams*, 267 F. 9, 14 (8th Cir. Mo. 1920) (2-year delay insufficient for laches defense to trademark infringement claim); *Coilcraft, Inc.*, 2007 U.S. Dist. LEXIS 52350 (almost five-year delay did not support laches defense laches to enforcement of consent judgment). Respondents cite no authority that the delay in this instance would be unreasonable.

Indeed, as Respondents admit, upon discovering the existence of Respondents' "The Butt Face" Facebook page, on April 12, 2011 (which only gained a following on April 1, 2011, immediately after the shutdown of The South Butt Facebook page), counsel for The North Face sent a letter to counsel for Respondents explicitly putting them on notice that the operation of the Facebook page was a clear violation of both the terms of the Agreement and the Injunction. *See* Ex. 1 to the Opp. The North Face specifically warned:

> In light of this clear, and seemingly intentional, breach and contempt, The North Face is well within its rights to seek recourse with the Court, including in an action for breach of contract or for an order of contempt for violation of the Consent Injunction. Pursuant to Section 2.2 of the Agreement, The North Face is also within its rights to withhold payment… to your clients, which payment is expressly conditioned on your clients *not breaching* the Agreement "in any way" and fully performing under the Agreement.

4

(Ex. 1 to Opp. at 2). The North Face also made it clear that despite the breach, it remained interested in finalizing the matter and "amicably resolving the issues." *Id.*

Respondents did not, as they do now, attempt to argue that the "The Butt Face" Facebook page was a parody, or that it was not otherwise in violation of the Agreement or the Consent Injunction. Rather, Respondents ***immediately disabled the "The Butt Face" Facebook page*** as evidenced by a later email just days later " . . . current versions of the page no longer appear to be available on Facebook") (*see* Ex. 2 to the Opp.) and by the timeline reflected in Respondents' Facebook page did not again go online until July 18, 2011, nearly two months after Respondents received a settlement payment. (Declaration of Matthew N. Hewlett, executed October 1, 2012 ("Hewlett Decl."), Ex. C.)

The North Face reminded Respondents in an April 25th email that "the absence of current links does not alleviate [Respondents] of [their] responsibility to identify all social media sites in [Respondents'] possession, custody or control 'at any time'." Counsel for Respondents April 26, 2011 letter in response did nothing to address any of the substantive points raised in the April 12 letter or April 25 email. Respondents asserted only vague threats against The North Face, relating to its payment to them under the terms of the settlement agreement, and averred in conclusory fashion that the Respondents were in full compliance with the settlement agreement and injunction. (Ex. 3 to the Opp.)

Because Respondents had discontinued their Facebook page and rather than run to Court for what could ultimately be a technical violation of refusing to identify its social media sites, The North Face chose to move forward in good faith and on May23, 2011 remitted payment to the Respondents pursuant to the terms of the Agreement.

It wasn't until July 18, 2011, after receipt of the monies, that Respondents once again went live with "The Butt Face" Facebook page. (*See* Hewlett Decl., Ex. C.) In retrospect it is clear from the timing of Respondents' actions that they only intended to cease use of "The Butt Face" Facebook page long enough to receive their pay-off and not out of respect for this Court's Injunction.

Courts will reject a defendant's assertion of the laches defense when the defendant knew that the plaintiff objected to the use of the mark. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996). "This rule can be understood either as an analogue to assumption of risk, or as a factor that prevents the defendant from suffering undue prejudice." *Id.* (citing 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:12 (4th ed. 2009)). "In either event, forewarning of a plaintiff's objections generally prevents a defendant from making a laches defense." *Id.* (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) ("Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts.")); *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 151-52 (5th Cir. 1985) (stating that defendant opened business "at its own peril, without the defense of laches" after receiving plaintiff's cease and desist letter); *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1546-47 (11th Cir. 1984) (denying laches defense where plaintiff notified defendants of potential infringement before defendant acquired mark).

The hypocrisy of Respondents' claim of laches is exemplified by their assertion that this dispute could have been avoided "if Plaintiff had so much as picked up the phone or written en email to Defendants' counsel." (Opp. at 4.) In fact, The North Face did just that in contacting Respondents' trademark counsel about the application to register THE BUTT FACE Mark. Why

6

Climb Mountains, LLC filed for registration of THE BUTT FACE Mark with the United States Patent and Trademark Office on August 5, 2011. The North Face filed for an extension of time to oppose as allowed under the Trademark Office rules. Before filing an opposition, The North Face in-house counsel, Mr. Christopher M. Turk, on July 25, 2012, reached out to Respondents' trademark counsel. *See* Supplemental Declaration of Christopher M. Turk ("Supp. Turk Decl."), ¶¶ 3-4. In response to Mr. Turk's question regarding what it would take to get Respondents to stop using the mark and abandon the trademark application, Respondents' trademark counsel replied that everyone knew his client was slightly crazy and so didn't know what it would take. *Id.* ¶ 4. He went on to say that Winkelmann, Sr. "really cleaned up last time" and that he hoped to do the same this time. *Id.* He also stated that Winkelmann, Sr. was just waiting for the "media storm" again. *Id.*

  While The North Face had all along taken steps to contest Respondents' use and registration of the THE BUTT FACE trademark, it was this conversation that made it apparent that The North Face had no choice but to bring the current motion. *See Lewis & Clark Outdoors, Inc. v. L.C. Indus.,* 2009 U.S. Dist. LEXIS 130621, at *13-*14 (W.D. Ark. July 22, 2009) (defendant's counterclaims not barred by laches and defendant "within its rights to choose not to pursue litigation" where plaintiff's "involvement in the market was limited to a single store and until Plaintiff's potential in the market was realized"); *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. Tenn. 1985) (reversing district court's ruling that laches barred both equitable and monetary relief stating, "[a] reasonable businessman should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue.")

7

Based upon Respondents' latest offer of settlement in a September 20, 2012 letter to G. Roxanne Elings from Albert S. Watkins -- "in exchange for a cash payment of $500,000.00, all five members of the Winkelmann immediate family will agree never to again sell, market, or assist in selling or marketing, directly or indirectly, any article of clothing or promote any trademark that would in any way be associated with The North Face Apparel Corp. products" -- there was no way to avoid this hearing unless The North Face was willing to live with the constant threat of extortion and ever-escalating demands.[1] The evidence shows that, far from an inexcusable delay, The North Face's delay in bringing this motion was not only wholly understandable and excusable; it was fully justified given Respondents' actions. The Court should reject Respondents' laches defense on this ground alone.

### 2. Respondents Have Not Been Unduly Prejudiced

Respondents also fail to show any prejudice. The prejudice contemplated by a laches defense must be "substantial," "material" or "serious." *See Coilcraft, Inc.*, 2007 U.S. Dist. LEXIS 52350 at *35. The only prejudice pointed to by Respondents is the time and resources expended in launching their apparel line under THE BUTT FACE Mark. (Opp. at 6.) But prejudice cannot consist merely of past expenditures that actually supported the alleged infringement. *Coilcraft, Inc.*, 2007 U.S. Dist. LEXIS 52350 at *35. This would ignore "the fundamental principle that laches does not allow an infringer to continue infringing." *Id.* "It is only, however, where the delay is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time that the balance of the equities would favor the knowing infringer." *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609,

---

[1] The Offer went on to state: "As an added defined benefit of this settlement, the entire Winkelmann family is prepared to agree not to market any product, the name for which includes any combination of a body part and direction(s) found on a compass." September 20, 2012 letter to G. Roxanne Elings from Albert S. Watkins.

8

615 (7th Cir. 1965). Here there is no such extended delay on the part of The North Face. For this reason as well, the Court should reject Respondents' laches defense.

### 3. Respondents' Laches Defense Is Barred By Unclean Hands

As an equitable doctrine, laches may not be used to shield a party from the consequences of conduct it knows to be wrongful. *Baker v. Simmons Co.*, 307 F.2d 458, 466 n.4 (1st Cir. 1962) (laches does not apply if defendant had a calculated design to trade upon plaintiff's reputation); *Stone v. Williams*, 891 F.2d 401, 404 (2d Cir. 1989); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 2007 U.S. Dist. LEXIS 75812, at \*13-\*14 (S.D.N.Y. Oct. 10, 2007). Respondents have flouted the terms of a Consent Injunction, even after being reminded of its terms, by continuing to sell and advertise clothing bearing a mark that is a colorable imitation of the THE NORTH FACE Trademark. Respondents' stated "goal" for doing so is to "make money" by engaging The North Face in yet another legal battle. (*See* Elings Decl., ¶2 and Ex. H.) They thus cannot claim the benefit of a laches defense. *See Fendi Adele S.R.L.*, 2007 U.S. Dist. LEXIS 75812, at \*13-\*14; *Stone*, 891 F.2d at 404. Further, Respondents admit they are trading off The North Face's reputation. In fact, it is part of Respondents' very business model that they trade off The North Face's reputation because that is what drives sales for them. (Opp. at 13.) Therefore, Respondents may not avail themselves of the equitable defense of laches.

Even if Respondents could avail themselves of laches as against The North Face – which it cannot – the defense of laches does not prohibit this Court's power to hold a litigant in civil contempt for alleged violations of its orders. Such power arises under two sources of authority: its statutory authority under 18 U.S.C. § 401, *see, e.g., Coleman v. Espy*, 986 F.2d 1184, 1190 (8th Cir.1993) (citing *Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1000 (8th Cir.1970)); *see also*

9

*Taylor v. Finch*, 423 F.2d 1277, 1279 (8th Cir. 1970) ("Courts have power to adjudge persons who willfully disobey their orders to be in contempt and such power extends to both civil and criminal contempt."), *cert. denied*, 400 U.S. 881 (1970); and its **inherent authority** to enforce compliance with its lawful orders, *see e.g., Spallone v. United States*, 493 U.S. 265, 276 (1990) (emphasis added); *see also Baker Elec. v. Otter Tail Power Co.*, 116 F.3d 1207, 1214 n.6 (8th Cir. 1997) (district court retains jurisdiction to ensure effectiveness of continuing order). The Supreme Court has long held that "the inherent powers of federal courts are those which 'are necessary to the exercise of all others.' " *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (quoting *United States v. Hudson & Goodwin,* 7 Cranch 32, 34, 11 U.S. 32, 3 L.Ed. 259 (1812)). *See Newman-Green, Inc. v. Alfonzo-Larrain R.,* 854 F.2d 916, 921-22 (7th Cir.1988) (en banc) (court discussing examples of specific procedures, such as the power to punish for contempt). Given Respondents' clear intent to use this Court's valuable resources for their own monetary gain without any respect for this Court's Injunction, the Court is clearly within its authority to protect the authority of and respect for its orders.

      **B.**      **The Safe Distance Rule Is The Law of This Circuit**

In a last ditch effort to escape a finding of contempt, Respondents, without authority, assert that the Eighth Circuit does not adhere to the "safe distance" rule.[2] (Opp. at 7-8.) In fact, the Courts in this District and within the 8th Circuit have recognized the "safe distance" rule for over 60 years. *See Coca-Cola Co. v. Cleo Syrup Corp.*, 56 F. Supp. 425, 427-28 (D. Mo. 1944) ("The due protection of trade-mark and similar rights requires that a competitive business, once convicted of unfair competition in a given particular, *should thereafter be required to keep a safe*

---

[2] In explaining how Respondents violated the "safe distance" rule, and in the absence of any dispute or contrary authority, we may have failed to cite the longstanding, mandatory authority in this Circuit in favor of more recent authority from other circuits. But, that does not excuse Respondents' affirmatively misleading statements, without authority, that the Eighth Circuit does not adhere to the "safe distance" rule.

10

*distance away from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified themselves.*" (quoting *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir. 1930))); *see also 3M Co. v. Mohan*, 2010 U.S. Dist. LEXIS 124672 at *72 (D. Minn., Nov. 24, 2010) ("Trademark infringers may be required to keep a safe distance from infringing a plaintiff's marks.")  Thus, Respondents' claim that this standard is "neither the law or embraced by this jurisdiction" (Opp. at 7) is false.

Even if Respondents were unaware of the Eighth Circuit cases applying the "safe distance" rule, ignorance of the law is no excuse, especially when considering claims of infringement.  *See Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1091 (D. Md. 1995) (holding defendants liable for copyright and trademark infringement for selling counterfeit Microsoft products despite defendants' claim that they were unaware of Microsoft's licensing requirements and had only recently entered the wholesale business).

Accordingly, because Respondents have failed to maintain a safe distance from the enjoined activity, they should be held liable for contempt.

    **C.**  **Respondents May Not Escape Contempt By Claiming Parody**

Respondents' attempt to recast Plaintiff's argument as a blanket assertion that parody is "unavailable in a trademark case" (Opp. at 9) does not substantively address the myriad of cases cited by The North Face showing how the parody defense may not be used to shield Respondents from liability here.  (*See* Memorandum of Law in Support of Plaintiff's Motion for Civil Contempt ("Memo.") at 10-12.)

Respondents use "parody" as some magic talisman in defense of dilution and infringement.  While parody is an available defense in dilution, Respondents cannot avail themselves of the defense because parody must fail as a defense of dilution when a mark is used

11

"as a designation of source for the person's own goods or services." 15 U.S.C. § 1125(c)(3); *see also Starbucks Corporation v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 112 (2d Cir. 2009) (finding the barrier to a parody defense "evident from the statutory language" where the defendant used its mark as a designation of source for its own coffee goods). Respondents demonstrated in official, public documentation their intent to use THE BUTT FACE Mark as a designation of source for their own goods when they applied for registration of the mark with the United States Patent and Trademark Office. *See* Elings Decl., ¶ 2, Ex. C. As such, Respondents cannot avail themselves of parody as a defense to dilution.[3]

Nor have Respondents cited a single case demonstrating how a parody defense can apply in a contempt proceeding as opposed to a case where a court is conducting an initial infringement analysis (where it is merely one of the factors in the analysis and not a complete defense). In the absence of such support, Respondents' bald assertion that they may avail themselves of the parody defense to escape liability for contempt falls short.

> D.   **Respondents Likelihood of Confusion Analysis Relies on Misstating The North Face's Arguments and Misstating the Law**

The North Face will not repeat its analysis of likelihood of confusion under the six *SquirtCo* factors as they were discussed in detail in their opening brief. Memo. at 16-17. Rather, The North Face will address some of Respondents' more egregious mischaracterizations of The North Face arguments and misstatements of law.

---

[3] Respondents' characterization of their use of the term "butt" in place of "north" as nothing more than "sophomoric," rather than "unwholesome or degrading" is wholly unavailing. It is true that the Tenth Circuit in *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987), the sole case relied upon by Respondents, affirmed the finding that "Lardashe," while perhaps "in poor taste . . . is not likely to create in the mind of consumers a particularly unwholesome, unsavory, or degrading association with plaintiff's name and marks." *Id.* at 1490. But the *Jordache* court was viewing the use of the "Lardashe" mark through the prism of parody, having already found the defendant to have intentionally used the mark for parody. *Id.* at 1489-1490. Here, as already discussed above, Respondents cannot avail themselves of the parody defense. Thus, the use by Respondents of the term "butt" in place of "north" can and should be held to constitute dilution by tarnishment. *See Anheuser-Busch, Inc. v. Andy's Sportswear, Inc.*, 40 U.S.P.Q.2d 1542 (N.D. Cal. 1996).

12

For purposes of its infringement analysis, The North Face does not seek to "have this Court enter a contempt order on the strength of the visual comparisons found in the Motion," contrary to Contempt Respondents' suggestion. This argument only highlights Contempt Respondents' failure to appreciate that the burden that applies in a contempt proceeding (to show whether the new trademark is so similar to the original mark that the injunction is violated) is different than under a full analysis of infringement. Thus, the court's statements in *Jordache*, that "side-by-side" comparison is not the test for similarity, are wholly inapplicable here. 828 F.2d at 1487-88. Moreover, to the extent a full analysis of infringement is undertaken, The North Face does not argue similarity alone is sufficient to constitute infringement; it is the fact that the marks are similar *in conjunction with* each of the other *SquirtCo* factors (all of which favor The North Face or are neutral) that supports a finding of infringement.

Although Respondents do not dispute that THE NORTH FACE Trademarks are "quite strong," they assert that the strength of THE NORTH FACE Trademarks actually cuts against a finding of infringement. (Opp. at 11-12.) Citing to *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727 (Fed. Cir. 1988), they first assert that the ubiquitous nature of THE NORTH FACE Trademark has given the public the ability to instantly recognize the Respondents' marks' variations from it. (Opp. at 11-12.) Respondents admit that *B.V.D.* an "outlier in the Trademark arena," but assert, without any support whatsoever, that it supports the proposition that "when confronted with unique facts, the Court may find a mark to be so famous that the consuming public's awareness of it is so heightened that it becomes conditioned to notice even small deviations." (Opp. at 12.) But the Federal Circuit in subsequent cases has expressly limited *B.V.D.* to its facts, and has made it clear that the fame of a mark can <u>never</u> weigh against a finding of likelihood of confusion. *See Kenner Parker Toys Inc. v. Rose Art*

13

*Industries Inc.*, 963 F.2d 350, 354 (Fed. Cir. 2000); *In re Recot Inc. v. Becton*, 214 F.3d 1322, 1327-28 (Fed. Cir. 2000); *see also Time Warner Entertainment Co. v. Jones*, 65 U.S.P.Q.2d 1650 (T.T.A.B. 2002).  There can be no clearer repudiation of the unsupported proposition forwarded by Respondents.  Respondents' second argument for why the strength of THE NORTH FACE Trademarks tip in favor of Respondents depends on their by now all too familiar, and ultimately doomed parody defense.  All of the cases cited by Respondents – *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 262 (4th Cir. 2007); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 416 (S.D.N.Y. 2002); and *Jordache*, 828 F.2d 1482 – depend on a successful claim of parody to support the inference that the strength of a famous mark cuts against the owner of that mark.  Here, Respondents may not avail themselves of the parody defense.  Thus, each of the cases cited and relied upon by Respondents is inapposite.

Because under *SquirtCo*, "no one factor controls," *see Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005), in the matter before this Court, the high degree of similarity and Respondents willful intent to trade upon THE NORTH FACE Trademarks strongly support a finding of likelihood of confusion.

## II.     CONCLUSION

In light of Respondents' multiple concessions and failure to address their violation of the Injunction, in addition to the other arguments set forth above and in The North Face's opening memorandum, Plaintiff respectfully urges the Court to grant this motion.

Respectfully submitted,

/s/ *Geoffrey G. Gerber*
Michael A. Kahn, #35411MO
Geoffrey G. Gerber, #47097MO
THE BRICKHOUSE LAW GROUP
        PROFESSIONAL CORPORATION
1006 Olive Street, Suite 303
St. Louis, MO  63101-2048
Telephone: (314) 932-1076
Facsimile:  (314) 932-1078
mkahn@brickhouselaw.com

G. Roxanne Elings (*pro hac vice*)
Charles A. LeGrand
DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, NY  10019-6708
Telephone: (212) 603-6416
Facsimile: (212) 379-5226

Attorneys for Plaintiff The North Face Apparel Corp.

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 1st day of October, 2012, a true copy of this Reply Memorandum and its attachments were caused to be served via the Court's electronic filing system on all counsel of record.

*/s/ Geoffrey G. Gerber*